Timothy Wayne TIPTON, Lyle Breece, George W. Leeson, Jr., and John Wilburn, individually and on behalf of all others similarly situated, Plaintiffs,

v.

SECRETARY OF EDUCATION OF the UNITED STATES; Higher Education Assistance Foundation, Inc., a Minnesota corporation; Charleston National Bank, a national banking association; One Valley Bank, a national banking association; Fed One Savings Bank, FA, a national banking association, including its Dunbar Branch (formerly The Bank of Dunbar); Community Bank & Trust, a national banking association; Atlantic Financial Federal–West Virginia, a federal savings association (formerly Magnet Bank); First Federal Savings & Loan Association of Morgantown, a federal savings association; Commercial Banking & Trust Company, a national banking association; Higher Education Loan Program of West Virginia, Inc., a corporation; Central National Bank, a national banking association; Wachovia Bank & Trust Company, a national banking association; Wachovia Services, Inc., a corporation; Marine Midland Bank, a national banking association; and Union Bank & Trust, Defendants.

Civ. A. No. 2:90–0105.

United States District Court, S.D. West Virginia, at Charleston.

June 21, 1991.

Daniel F. Hedges, Charleston, W.Va., William W. Carter, Fayetteville, W.Va., for plaintiffs.

Rebecca A. Betts, King, Betts & Allen, Charleston, W.Va., George J. Anetakis, Weirton, W.Va., Keith J. Pappas, Morgantown, W.Va., Stephen R. Brooks, Furbee, Amos, Webb & Critchfield, Fairmont, W.Va., K. Paul Davis, Spilman, Thomas, Battle & Klostermeyer, Charleston, W.Va., Fred Marinucci, U.S. Dept. of Justice, Washington, D.C., James K. Brown, John Philip Melick, Jackson & Kelly, Dana F. Eddy, Joseph R. Goodwin, Michael L. Keller, Goodwin & Goodwin, Charleston, W.Va., George A. Markusic, Morgantown, W.Va., Gary A. Call, Asst. U.S. Atty., Charleston, W.Va., for defendants.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on the motions to dismiss filed by the Secretary of Education of the United States, the Higher Education Assistance Foundation, Inc., and each of the defendant banks named in the

plaintiffs' amended complaint.[1]

## I.

The plaintiffs, Timothy Wayne Tipton, Lyle Breece, George W. Leeson, Jr., and John Wilburn,[2] filed this action for declaratory and other relief under the Higher Education Act of 1965 (hereinafter "HEA"), 20 U.S.C. § 1071, *et. seq.*, and implementing regulations,[3] against the defendant Secretary of Education of the United States, (hereinafter "Secretary"), the Higher Education Assistance Foundation, Inc. (hereinafter "HEAF"), and the following bank defendants named in the amended complaint: Charleston National Bank; Community Bank & Trust; One Valley Bank of Morgantown; Fed One Savings Bank; United National Bank; Atlantic Financial Federal–West Virginia; First Federal Savings & Loan Association of Morgantown; Commercial Banking & Trust Company; Higher Education Loan Program of West Virginia, Inc. (hereinafter "HELP");[4] Central National Bank; Wachovia Bank & Trust Company; Wachovia Services, Inc.; Marine Midland Bank; and Union Bank and Trust.

Plaintiffs in this action were former vocational students at the now defunct Northeastern Business College (hereinafter "NBC"), whose educations at that institution were funded in part with student loans obtained through the federally sponsored Guaranteed Student Loan Program ("GSLP").[5] The plaintiffs' loans were received from one or more of the defendant banking institutions, consistent with the GSLP, in order to pay their tuition and other costs related to their attendance at NBC. The defendant HEAF guaranteed these loans, and the defendant Department of Education, which administers the GSLP, provided the lenders with interest subsidies

1. For the purposes of this order, all defendants except for the Secretary and HEAF are referred to as the "defendant banks." It is noted, however, that the following defendants are alleged to have been the lenders on, or the "conduits" of, the student loans in question: Charleston National Bank (334 class members); Community Bank & Trust (381 class members); One Valley Bank Morgantown (116 class members); One Valley Bank Charleston (7 class members); Fed One Savings Bank (136 class members); United National Bank, Charleston (126 class members); United National, Dunbar branch (254 class members); Atlantic Financial Federal (70 class members); First Federal Savings & Loan (94 class members); Commercial Banking & Trust (55 class members); Higher Education Loan Program of West Virginia, Inc. (102 class members); and Central National Bank (85 class members).

   The defendants Wachovia Bank & Trust Company and its subsidiary, Wachovia Services, Marine Midland Bank and Union Bank & Trust are referred to in the amended complaint as "conduit[s]/holder[s] or servicing agent[s]" on the student loans in question and are apparently involved in this action not because of their role as original lenders but by virtue of their ultimate purchases of the notes in question on the secondary market. Counsel for those defendants has noted, however, that initial investigation reveals that Marine Midland may have in fact actually originated some of the loans in question. The defendant Wachovia Services allegedly "serviced" every Charleston National Bank loan pursuant to a contractual agreement between Charleston National and Wachovia Services.

   It is observed that the motion to dismiss of the defendant Union Bank & Trust was improperly filed on May 17, 1990, in *Tipton, et al. v. Northeastern Business College*, Civil Action No. 2:86–1280 ("Tipton I"). That motion will be deemed filed in this action for the purposes of this decree.

2. Plaintiffs have filed this action on behalf of themselves individually, and on behalf of others similarly situated. Class certification has been deferred pending resolution of the questions of law raised in the defendants' motions to dismiss.

3. Unless otherwise noted, all statutory and regulatory provisions cited refer to the provisions of the Act and regulations in effect during the period of time in which the loans at issue were made.

4. The defendant HELP occupies a different position than that of the other bank and lender defendants. HELP allegedly made a number of loans to NBC students between 1980 and 1983 as a West Virginia "lender of last resort." *See* 20 U.S.C. § 1078(j). As a statutory lender of last resort, HELP was required to make student loans to individuals who were not otherwise able to obtain a loan from a commercial lender and who met other eligibility requirements of the program. HELP asserts that all loans which it made have either been paid, cancelled or assigned to HEAF and thus it no longer holds any of the subject notes.

5. In 1986, the Guaranteed Student Loan Program was renamed the "Stafford" loan program.

on the loans and contracted to reinsure HEAF for its losses occasioned by payments made on its loan guarantees.

In their amended complaint, plaintiffs allege that they were unable to obtain adequate educational training at NBC because the school was inadequately staffed and equipped to provide such training. Plaintiffs further allege that NBC fraudulently misrepresented its ability to provide them the vocational training upon which the subject indebtedness is based. Although NBC is not named as a defendant in this action, plaintiffs seek a declaration that their student loan obligations, now in default, are unenforceable by the named defendants, arguing that, under various theories of state and federal law, the defendants are each subject to the claims and defenses which the plaintiffs could raise against NBC on the enforceability of the subject loans. In addition to seeking a declaration from the court that their student loans are void and subject to no further enforcement by any of the named defendants, plaintiffs seek a rescission of any future payment obligations on the loans and reimbursement of any monies previously paid in partial satisfaction of the loans. Plaintiffs expressly disavow, however, any claim for monetary damages for noncompliance by the defendants with the statutory and regulatory requirements of the guaranteed student loan program. *See* Plaintiffs' Brief in Opposition to Defendants' Motions to Dismiss at 137.

Each of the defendants has filed motions to dismiss pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, alleging that the plaintiffs have failed to state claims against them upon which relief can be granted. In analyzing the viability of the various legal theories advanced by plaintiffs to avoid repayment of their loan obligations, and the defendants' motions in opposition thereto, it is helpful at the outset to briefly examine the plaintiffs' allegations regarding their experience with, and the eventual demise of, Northeastern Business College.

## II.

According to plaintiffs, Northeastern Business College operated during the period of time in question in this case as a mere "sham" organization which grossly misrepresented its facilities and fraudulently promised to potential enrollees non-existent educational and employment opportunities. Plaintiffs argue that, despite gaining notoriety for its fraudulent and deceptive educational practices,[6] NBC was improperly permitted to continue to participate in the GSLP until 1986, and consequently collected millions of dollars in tuition fees from GSLP loans issued to what plaintiffs describe as undereducated, low income students.

One of the named plaintiffs' experiences with NBC is said to be representative. Finding his minimum wage job insufficient to support his wife and two young children, the plaintiff responded to a newspaper advertisement by NBC regarding its offering of a "security and law enforcement" course. He was allegedly told by NBC representatives, among other things, that he would be eligible for part-time work while attending school, that all course materials and polygraph training would be provided, that the school had extensive equipment and library facilities, and that the training would cost nothing at the time—"the federal government would provide GSL loans to pay for his training."

The course offering was, according to plaintiffs, meaningless. They contend, for example, that NBC did not have the facilities represented, did not offer the training promised, and that the course was designed merely to attract a large number of low income individuals with minimal education-

---

**6.** A civil action was commenced in 1983 in the Circuit Court of Ohio County, West Virginia, pertaining to the improper business practices of the now-defunct NBC. In that action, the Circuit Court of Ohio County held, by order dated September 4, 1986, that NBC had violated West Virginia's Unfair and Deceptive Practices Act and had entered into unconscionable contracts with the students. Pursuant to that court's order of May 29, 1987, the contracts entered between NBC and all students enrolled there between 1979 and 1986 were declared null and void. *See Perry–Alltop v. Northeastern Business College, Inc.*, CA 83–C–2514.

al achievement who would qualify for GSL program funds. The only promise kept, plaintiffs' allege, is that the individual received a loan for his education, albeit one which he did not receive.

Plaintiffs assert that NBC could not have existed without the GSLP, as managed by the Secretary and HEAF, and contend that the school was improperly permitted to arrange for thousands of students to take out GSL loans, with the proceeds of those loans being paid directly to the school, thereby bypassing the students entirely. Plaintiffs assert that the Secretary and HEAF, being knowledgeable about the improper practices of the school, stood idly by while NBC "pocketed the cash," leaving the students with nothing but dashed hopes and additional indebtedness:

> Although HEAF and the Secretary knew of the numerous problems at NBC, neither did anything to sanction NBC or to otherwise protect students whose GSL loans were going straight to NBC. NBC had an open-ended contract with the Secretary to participate in the GSL program.... Because of the Secretary's and HEAF's failure to monitor NBC's use of the GSL program, class members were recruited to sign GSL loans, with the proceeds going to NBC for vocational training that NBC could not provide.

> Now the defrauded students are being pursued by the Secretary, HEAF, and various banks to pay amounts pursuant to these notes for something they never received. As a result, their individual lives are being substantially and detrimentally affected.

Plaintiffs' Brief, at pp. 3–4.

Plaintiffs contend that, after ceasing to pay on their student loans for education never received, they have been subjected to a wide range of coercive collection practices. Specifically, plaintiffs allege that they have received threatening telephone calls and "dunning" letters, have had income tax refunds intercepted, have been precluded from qualifying for other educational loans, and have had their credit records ruined. They assert:

> The collection practices of the government and HEAF are often more onerous than those of many private creditors. The government turns over student loans to out-of-state collection agencies which often violate federal and state collection laws. The guaranty agency HEAF does some of its own collection work and contracts out a substantial portion to collection agencies. Their collection practices are similarly onerous and abusive.

> In virtually no situations known to plaintiffs' counsel have suits been initiated against the class members so that they might have the opportunity to assert defenses against the loans. Rather, their lives are ruined by the inability to get credit precluding home purchases, and by being harangued by calls and correspondence from collectors.

Plaintiffs' Brief, at p. 6.

One of the plaintiffs' more sweeping allegations is that the losses which they have allegedly sustained as a result of their NBC experience stems from the defendants' failure to adequately evaluate and monitor the qualifications and programming of schools participating in the GSLP. This failure, plaintiffs argue, has opened the door to widespread abuse of the entire student loan program and its individual participants. As a result of allegedly insufficient evaluation and monitoring of trade schools such as the now-defunct Northeastern Business College, plaintiffs contend that proprietary schools such as NBC have been permitted to become businesses whose primary goal is to process student loan funds received through the GSLP. They argue that the Department of Education, the school, the banks, and the guaranty agency are all closely entwined participants in the GSL program and that many students are attracted to schools such as NBC because of the credibility which institutional participants, especially the federal government, give to schools deemed eligible to participate in the GSL program. Nonetheless, and despite the close interrelationships alleged, plaintiffs state:

> Now that NBC has been discredited, all the institutions who supplied money to

NBC—the banks, HEAF, and the Secretary—are furiously pointing fingers at each other, each claiming it is not responsible for the actions of the school or for anything else. In spite of the attempts of these parties to distance themselves from the school and each other, the reality of the GSL program is very different. The GSL loans are issued in a highly regulated environment where the school and lenders work very closely together, where every action taken by the school and lenders is orchestrated by HEAF and the Secretary, and where every action taken by HEAF is supervised by the Secretary.

*See* Plaintiffs' Brief at p. 10.

Based upon the highly-regulated nature of the GSLP and the allegedly close relationship between the bank defendants and NBC, as well as between the banks, HEAF and the Secretary, plaintiffs argue, collectively, that the "defendants are responsible for the entire GSL enterprise and NBC's fraudulent use of it." More specifically, however, plaintiffs' complaint focuses in substantial part upon the conduct of HEAF and the Secretary for allegedly failing to enforce certain statutory and regulatory guidelines of the guaranteed student loan program.[7]

### III.

The Higher Education Act of 1965, (hereinafter "HEA") was enacted in an effort to address the growing need for financial assistance for students in higher education. 20 U.S.C. §§ 1060–1098. A variety of financial aid components comprise the HEA, including but not limited to the Pell Grant Program, 20 U.S.C. § 1070a, and the Guaranteed Student Loan Program ("GSLP"), 20 U.S.C. § 1071, *et seq.* *See also* C.F.R. 668.1(b).

The GSLP, which is at issue here, has two separate and distinct parts: (1) a guaranty agency program under which a state agency or private non-profit agency such as HEAF guarantees the student loans and is, in turn, reimbursed under a reinsurance agreement by the Secretary for part or all of the insurance claims which they pay to the lenders on defaulted notes, 34 C.F.R. § 682.100(a)(1); and (2) the Federal Insured Student Loan Program ("FISLP") under which the student loans are guaranteed by the federal government directly, 34 C.F.R. § 682.100(a). *See* 20 U.S.C. § 1071(a). There is no dispute between the parties to this action that the lenders on the student loans at issue received their guarantees on those loans from guaranty agencies, primarily HEAF, rather than from the government directly. Moreover, HEAF and the Department of Education have, at all relevant times, been parties to a reinsurance agreement as provided for in 20 U.S.C. § 1071(c).

Pursuant to the provisions of the HEA and the applicable regulations promulgated by the Secretary to implement the provisions of the Act, private lenders make loans to qualified borrowers in furtherance of their education at eligible post-secondary schools. When, in cases such as this, a student loan is in default under the guaranty agency program, the guaranty agency pays the holder of the loan pursuant to the terms of its guaranty, and, under its reinsurance agreement with the Secretary, may thereafter be reimbursed for some or all of the funds which it has expended in paying the default claim to the holder of

---

7. Although the plaintiffs have named the multiple banking and lending institutions as parties defendant, their amended complaint asserts that "[a]s a practical matter, these banks are little more than conduits or servicing agents for HEAF and the Secretary." Amended Complaint at ¶ 76. Plaintiffs point out that "[s]tudents could never raise defenses against these banks as a defense to a suit on the loan because the banks never bring suit on a GSL but always turn loans over to HEAF." *Id.*

Nearly all of the notes in question are now held by HEAF or the Secretary and not the lender defendants. Nonetheless, plaintiffs have apparently included the lenders as parties defendant, seeking to obtain a declaration that the banks would be subject to any claims or defenses against the student loan notes if an enforcement action on the same were brought by the lender, and that HEAF and the Secretary are, in turn, also subject to those defenses. It is also noted that the plaintiffs have asserted a RICO claim against all of the defendants which the parties have not yet fully briefed and which will not be addressed nor resolved herein.

the note. Under the regulatory provisions pertaining to reinsurance/guarantee agreement cases, the guaranty agency must pursue, with "due diligence" collection on any defaulted loan on which it has received reimbursement. 20 U.S.C. § 1078(c)(2); 34 C.F.R. § 682.200 & 34 C.F.R. § 682.-401(b)(15)(3).[8]

The HEA also provides for direct federal subsidies to be paid to lenders on loans made to qualified borrowers. For example, the holder of a qualifying loan is to be paid the interest accruing on the loan during which time the student is enrolled and attending school, during a six (6) month post-enrollment grace period, and during certain authorized deferment periods. *See* 20 U.S.C. § 1078(a)(1), (b)(1)(A). The Department of Education also pays to the holder, for the life of a qualifying loan, a "special allowance," which is calculated to provide the holder a specified rate of return on the amount of the loan. *See* 20 U.S.C. § 1087-1(b).[9]

That the GSLP is a highly-regulated program governed by a myriad of statutory and regulatory provisions is not subject to debate. Under the program, for example, federal benefits are available only for loans made to students attending an "eligible institution," within the meaning of 20 U.S.C. § 1085(a)-(c). The "eligible institution" must also have executed a program participation agreement with the Department of Education which spells out in detail that its participation in the program is conditioned upon total compliance with the provisions of the Act. *See* 20 U.S.C. § 1094(a); 34 C.F.R. § 668.11(d).

Between 1981 and 1986, the period of time at issue in this case, the term "eligible institution" was defined to include a "vocational school" which:

(1) admits as regular students only persons who have completed or left elementary and secondary school and who have the ability to benefit from the training offered by such institution; (2) is legally authorized to provide, and provides within the State, a program of postsecondary vocational or technical education designed to fit individuals for useful employment in recognized occupations; (3) has been in existence for two years ... (4) has been accredited by a nationally recognized accrediting agency or association listed by the Secretary pursuant to this clause....

20 U.S.C. § 1085(c) (1985).[10]

The "accreditation" of vocational schools as referenced in 20 U.S.C. § 1085(c) is, the Secretary argues, properly vested in nationally recognized accrediting agencies which have been determined by the Secretary to be reliable authorities as to the quality of the training offered at schools seeking to participate in the GSLP. The Secretary determines which accrediting agencies are to be recognized, with agencies being required to submit a petition to Education detailing compliance with regulatory criteria pertaining to its role and function within the HEA. Accrediting agencies may be given a five-year recognition by the Department of Education, a conditional recognition, or rejection. According to a Declaration submitted by the Secretary, accrediting agencies may be reevaluated at the Secretary's discretion. *See* Ross Declaration, attached unmarked to Secretary's Motion to Dismiss.[11]

---

**8.** It is noted that the Department of Education may, under 20 U.S.C. § 1078(c)(8), demand assignment to the Secretary of any loan of which the guaranty agency is the holder, and for which the Secretary has made a reinsurance payment pursuant to 20 U.S.C. § 1078(c)(1), if the Secretary determines that the protection of the federal fiscal interest so requires. *See* 20 U.S.C. § 1078(c)(8).

**9.** The "special allowance" is, pursuant to 20 U.S.C. § 1087-1(b)(2), calculated to provide a return on the loan equal to the average of the bond equivalent rate of the 91–day T-bills auctioned for the quarter, plus 3.25 percent.

**10.** The GSLP regulations in effect between 1981 and 1985 incorporated this basic definition of "vocational school." *See* 34 C.F.R. § 682.200 (1985).

**11.** The Secretary contends that the Department of Education is statutorily barred from evaluating the educational offerings of a school seeking to participate in Title IV, HEA programs. *See* Brief of Secretary, at p. 5, citing 20 U.S.C. § 1232a, 3403.

According to the Secretary, NBC was regarded as an "eligible institution" under the GSLP and other Title IV, HEA programs commencing in 1972 when, under its former name (West Virginia Career College), it established its licensure by the State of West Virginia and its accreditation by the Accrediting Commission of the Association of Independent Colleges and Schools (hereinafter "AICS"). There is apparently no dispute that AICS, which accredited NBC, was and has been continuously recognized by the Secretary since 1956. Plaintiffs contend, however, that the Secretary's reliance upon accrediting agencies such as AICS for determining the educational quality of schools seeking to participate in the GSL is, in practical effect, "outlandish" and insufficient to protect the integrity of the student loan program and the rights of individual student borrowers thereunder.

### IV.

In this action, plaintiffs seek a declaration that they, as GSL borrowers, may assert any claims and defenses which they have against NBC against the bank defendants, the guarantee agency HEAF, and against the Secretary, arguing:

(1) that West Virginia common and statutory law, as well as federal common and statutory law, renders the bank defendants, and in turn, HEAF and the Secretary, subject to the students' claims and defenses;

(2) that the bank defendants are subject to such defenses to the extent that they had an origination relationship with NBC;

(3) that the Federal Trade Commission's "Holder Rule" applies and renders the defendants subject to the students' claims and defenses;

(4) that HEAF took the notes with notice of the defenses which the students had against NBC;

(5) that HEAF and the Secretary are not entitled to claim that the students' claims and defenses are cut off as to them because they are not holders in due course on the notes at issue; and

(6) that there was not a negotiable instrument or waiver of defense clause in the loan contracts.

*See* Amended Complaint, Prayer, at ¶ 2(a)-(vi) (pertaining to HEAF and the Secretary) and ¶ 2(b)(i)-(ii) (pertaining to the lenders).

As to HEAF and the Secretary specifically, plaintiffs also submit multiple additional theories upon which those defendants should be held subject to the students' claims and defenses, specifically arguing that HEAF and the Secretary were actually the "ultimate lenders" in the loan transactions at issue;[12] and that HEAF and the Secretary should be estopped from insulating themselves from the students' claims and defenses because of the control which they exert over the student loan program.[13]

As to the Secretary alone, plaintiffs argue that the Secretary should be unable to enforce the student loans due to failure to properly evaluate the financial responsibility of NBC;[14] due to failure to properly determine which accrediting agency was a reliable authority to ascertain the quality of education or training offered by NBC;[15] and due to a breach in the Secretary's duty to investigate the continued eligibility of NBC as a participant in the GSLP.[16] Plaintiffs further contend that the Secretary should be held subject to the students' claims and defenses under general principles of agency law and argue that they are entitled to rescission of their student loan obligations and reimbursement of monies paid to date on the loans due to the Secretary's general failure to safeguard the plaintiffs' educational interests.

Finally, as to HEAF alone, plaintiffs contend that HEAF should not be permitted to collect on the students' notes inasmuch as, in its role as guaranty agency, HEAF has allegedly failed to comply with the di-

---

**12.** *See* Amended Complaint at ¶ 2(c).

**13.** *See* Amended Complaint at ¶ 2(d).

**14.** *See* Amended Complaint at ¶ 2(g).

**15.** *See* Amended Complaint at ¶ 2(h).

**16.** *See* Amended Complaint at ¶ 2(i).

rectives of the HEA and implementing regulations. *See* Amended Complaint, Prayer, at ¶ (k). They assert further that HEAF has acted as an insurer of legally unenforceable loan obligations and has improperly attempted to collect on those obligations in violation of explicit regulations promulgated by the Secretary, thus rendering collection on the notes by HEAF improper as a matter of law. *Id.* at (1).

## V.

In considering the various theories urged by plaintiffs upon which to hold the defendants subject to the students' school-related defenses, it is noted that the plaintiffs and the Secretary, against whom the majority of plaintiffs' wrath appears to be directed, actually agree on one very significant issue. Specifically, the Secretary has consistently embraced the position that:

> If plaintiffs establish a defense to repayment under either State or Federal statutory or common law, they will obtain the relief they seek, because Education's rights against them are *subject to* defenses that accrued against the original lenders prior to the assignment of the loans, after default, to HEAF.

*See* Secretary's Reply Brief, at p. 3 (emphasis in original).[17] Apparently, under the Secretary's view of the dispute, if the court concludes that borrower defenses have accrued against the original lenders pursuant to the theories of state and/or federal law asserted by plaintiffs, then the plaintiffs' loan obligations are both uninsurable and unenforceable by the Secretary as well and no further collection actions will be taken against the students to satisfy their loan obligations.[18]

Importantly, however, the bank defendants and HEAF vigorously contest the various theories upon which the plaintiffs base their argument that they are subject to the claims and defenses which the students would have against NBC. They contend, in large measure, that the state statutory consumer laws upon which plaintiffs rely are preempted by the HEA, and assert further that, under the HEA and implementing regulations, the only times in which a student's guaranteed student loan obligation may be forgiven are in cases of death, disability or discharge in bankruptcy.

## VI.

Plaintiffs argue that application of West Virginia's consumer protection statute, W.Va.Code § 46A-2-103, clearly establishes that the original lenders and their assignees, particularly, HEAF and the Secretary, are subject to the claims and defenses which the students could assert against NBC. W.Va.Code § 46A-2-103. *See also* W.Va.Code § 46A-2-102.[19] The statutory provision pertaining to lender liability relied upon by plaintiffs, W.Va.Code § 46A-2-103, states:

> (2) The following provisions shall be applicable to the claims and defenses of borrowers, arising from consumer sales, with respect to consumer loans made after the expiration of one year after the date this chapter becomes operative: A lender, other than the issuer of a lender credit card, who, with respect to a particular transaction, makes a consumer loan for the purpose of enabling a borrower to buy goods or services, other than primarily for an agricultural purpose, is subject to all claims and defenses of the

---

**17.** *See also,* Secretary's Brief in Support of Education's Motion to Dismiss, at p. 35 ("the Department does not dispute plaintiffs' general claim in Count I that defenses to the loan contract itself may be available against the Department").

**18.** It is unclear at this juncture, however, what action the Secretary intends to take against the various lenders and/or HEAF in this case if it is determined that the bank defendants who, in the vast majority of cases no longer hold the notes, are subject to defenses the student would

have against the school on the enforceability of the loans.

**19.** W.Va.Code § 46A-2-103 pertains to conditions under which a lender will be held subject to consumer claims or defenses; W.Va.Code § 46A-2-102 pertains to conditions under which assignees of contracts and writings other than negotiable instruments be subject to consumer claims or defenses; W.Va.Code § 46A-2-101 deals with conditions under which holders of a negotiable instrument will be subject to consumer claims and defenses.

borrower against the seller arising from that specific sale of goods or services if the lender participates in or is connected with the sales transaction as provided in subdivision (a), subsection (1) of this section, without regard to the provision therein as to notices.

W.Va.Code § 46A–2–103(2).

Subdivision (a), subsection (1) referred to in W.Va.Code § 46A–2–103(2)—exclusive of the notice provision specifically excepted—states in pertinent part as follows:

(1)(a) A lender, other than the issuer of a lender credit card, who, with respect to a particular transaction, makes a consumer loan for the purpose of enabling a borrower to buy goods or services, other than primarily for an agricultural purpose, is subject to all claims and defenses of the borrower against the seller arising from that specific sale of goods or services if such lender participates in or is connected with the sales transaction.... Without limiting the generality of the foregoing, a lender is deemed to be connected with such sales transaction if:

(i) The lender and the seller have arranged for a commission or brokerage or referral fee for the extension of credit by the lender;

. . . .

(iv) The lender directly supplies the seller with documents used by the borrower to evidence the transaction or the seller directly supplies the lender with documents used by the borrower to evidence the transaction;

(v) The loan is conditioned upon the borrower's purchase of the goods or services from the particular seller, but the lender's payment of proceeds of the loan to the seller does not in itself establish that the loan was so conditioned; [or]

(vi) The seller in such sale has specifically recommended such lender by name to the borrower and the lender has made ten or more loans to borrowers within a period of twelve months within which period the loan in question was made, the proceeds of which other ten or more loans were used in consumer credit sales with the seller or a person related to the seller, if in connection with such other ten or more loans, the seller also specifically recommended such lender by name to the borrowers involved;

W.Va.Code § 46A–2–103(1)(a).

Plaintiffs argue that, pursuant to this statute, a lender who makes a consumer loan to a borrower for the purchase of goods or services is, as a matter of law, subject to all claims and defenses which the consumer has against the seller of those services, if that lender is "connected with" the sales transaction in one of the seven ways enumerated therein. *See* W.Va.Code § 46A–2–103(1)(a)(i)–(vii).

In their amended complaint, plaintiffs assert that the banking defendants, through their role in the GSLP, possess the necessary "connection" with NBC in accordance with four of the subsections of § 46A–2–103, so as to subject the lender to the claims and defenses which the students would have against the school. They specifically assert, as to Charleston National Bank, that the bank had an origination relationship [20] with NBC as defined by 34 C.F.R. § 682.200, whereby "the school informed students of the availability of the GSL program and assisted students applying for federally guaranteed student loans from the bank." Amended Complaint at ¶¶ 142, 151–154. They also contend that Charleston National paid to NBC a referral or "finders fee" in the amount of $10.00 for each loan referred to it by NBC. *See* Amended Complaint at ¶¶ 142–143.[21]

---

**20.** According to the plaintiffs, the existence of an origination relationship renders the lenders, and in turn HEAF and the Secretary, subject to the students' claims and defenses against NBC as a matter of federal law, even if the court concludes that the state statute is inapplicable. *See* discussion at pp. 565–70 *infra*. An origination relationship is a "special relationship between a school and lender, in which the lender delegates to the school, or to an entity or individual affiliated with the school, substantial functions or responsibilities normally performed by lenders before making loans." *See* 34 C.F.R. § 682.200(b).

**21.** Plaintiffs contend that, when NBC shut its doors in 1986, Charleston National allegedly turned over "most of the student loans" to HEAF, who then reimbursed the bank for all

Plaintiffs likewise assert that origination relationships existed between several of the other original lender defendants and NBC.[22] Again, their position in this regard is predicated on the assertion that each lender "delegated to NBC certain functions normally performed by lenders before making loans." *See* Amended Complaint at § 149. They also specifically contend as to all the defendant banks that "each of the defendant Banks and the HEAF affiliate lender [HELP] delegated to NBC certain functions normally performed by lenders before making loans," that NBC had a "business relationship with each defendant Bank," that NBC routinely referred students to the defendant Banks, that NBC "used applications/promissory notes upon which each of the defendant Banks had stamped its name as the lender," and had "supplied the school with the HEAF loan documents used by the student borrowers to evidence the transaction." *See* Amended Complaint at ¶¶ 142–154.

In opposition to the defendants' motions to dismiss, plaintiffs argue that the facts alleged in their amended complaint which pertain to the close relationship between the bank defendants and NBC clearly invoke subparagraphs (i), (iv), (v) and (vi) of W.Va.Code § 46A–2–103(1)(a) and support their claim that the bank defendants are subject to the students' claims and defenses against NBC. They specifically assert that subparagraph (i) of § 46A–2–103(1)(a) pertaining to "finders fees" is clearly applicable to the actions of the defendant Charleston National Bank. Subparagraphs (iv), (v) and (vi) are said to be applicable to all of the lenders inasmuch as the student loans were uniformly conditioned "upon the

borrower's purchase of goods or services from the particular seller," § 46A–2–103(1)(a)(v), inasmuch as the lenders "supplie[d] the seller with documents used by the borrower to evidence the transaction," § 46A–2–103(1)(a)(iv), and inasmuch as the sellers "specifically recommended such lender by name to the borrower ...." W.Va.Code § 46A–2–103(1)(a)(vi). *See* Plaintiffs' Brief at pp. 33–34.

Plaintiffs further argue that assignees of the original lenders are also subject to the students' claims and defenses on the basis that the term "lender," by definition, includes assignees of the lender. *See* § 46A–1–102(21). Although plaintiffs acknowledge that assignees do not *per se* acquire the obligations of the lender,[23] they argue that if an assignee seeks to avail itself of the same rights as the lender and attempts to collect on the loans, it must step into the lender's shoes with regard to defenses pursuant to § 46A–2–103(2). *See* Plaintiffs' Brief at p. 35. Plaintiffs also argue that, under state and federal common law, "assignees are by operation of law subject to defenses that could be raised against the assigned [sic]." *Id.,* citing *Lightner v. Lightner,* 146 W.Va. 1024, 124 S.E.2d 355 (1962); *Capital Investors Co. v. Executors,* 484 F.2d 1157 (4th Cir.1973); *United States v. Kellerman,* 729 F.2d 281 (4th Cir.1984).

The defendant lenders and HEAF vigorously contest the applicability of state law defenses, and the state statutory law relied upon by plaintiffs to hold the bank defendants and HEAF subject to those defenses, arguing *inter alia* that the HEA specifies only three (3) times in which a GSLP loan may be forgiven,[24] and that the scheme of

amounts in default. The brief submitted on behalf of Charleston National Bank, Wachovia Bank and Trust, and Marine Midland Bank indicates that those defendants "presently hold only a handful of NBC student loans." *See* Brief of Charleston National Bank, et al., at p. 16.

**22.** Plaintiffs contend that the defendants Charleston National Bank, Community Bank & Trust, One Valley, Fed One Savings, United National, *Atlantic Financial,* First Federal Savings & Loan, Commercial Banking & Trust, HELP, and Central National Bank each had origination relationships with NBC within the meaning of

34 C.F.R. § 682.200. *See* discussion, pp. 565–70, *infra. See also* Amended Complaint at ¶¶ 142, 145–148E.

**23.** W.Va.Code § 46A–1–102(21) states that "[e]xcept as otherwise provided, 'lender' includes an assignee of the lender's right to payment but use of the term does not itself impose on an assignee any obligation of the lender."

**24.** *See* 20 U.S.C. § 1087(a) & (b) wherein Congress has specified that a GSLP loan may be discharged if the student dies, becomes disabled, or receives a discharge in bankruptcy. *See also,* discussion, *infra,* at pp. 554–57.

federal regulation pertaining to the GSLP is so persuasive as to establish that Congress intended to leave no room for state law to supplement the regulatory scheme of the HEA through application and enforcement of state consumer laws. Moreover, the defendant lenders and guaranty agency argue that enforcement of the state consumer protection laws relied upon by plaintiffs in this case are in irreconcilable conflict with both the letter and the spirit of the governing federal statute and regulations and are, therefore, preempted entirely by the federal law embodied in the HEA.

### A.  *Preemption of State Consumer Laws*

■ The Supremacy Clause of Art. VI of the United States Constitution provides Congress with the power to preempt state law. Such preemption may result not only from action taken by Congress itself, but also when a federal agency acts within the scope of its congressionally delegated authority. *See Louisiana Public Service Comm'n. v. FCC,* 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1985).

■ The United States Supreme Court has consistently recognized that, in determining whether a state statute is preempted by federal law and thereby rendered unenforceable under the Supremacy Clause, the Court's sole task is to ascertain the intent of Congress. *See California Federal Savings & Loan v. Guerra,* 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1986); *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 2898–99, 77 L.Ed.2d 490 (1983); *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1189–90, 55 L.Ed.2d 443 (1978).

In ascertaining congressional intent, the Court has recognized several different ways in which state law may be pre-empted:

First, when acting within constitutional limits, Congress is empowered to preempt state law by so stating in express terms. Second, Congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation ... As a third alternative, in those areas where Congress has not completely displaced state regulation, federal law may nonetheless pre-empt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*See California Federal Savings & Loan v. Guerra,* 479 U.S. 272, 280–81, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (citations omitted).

The Supreme Court has also cautioned that "pre-emption is not to be lightly presumed," *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2128–29, 68 L.Ed.2d 576 (1981), and has, in fact, recognized a presumption against preemption of state law in areas traditionally regulated by the States. *California v. ARC America Corp.,* 490 U.S. 93, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989), citing *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 716, 105 S.Ct. 2371, 2376–77, 85 L.Ed.2d 714 (1985). Thus, in *Rice v. Santa Fe Elevator Co.,* the Court specifically held that, when Congress legislates in a field traditionally occupied by the states, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

None of the parties to this action contend that Congress has explicitly preempted state law in the enactment of the HEA or its implementing regulations. Instead, the bank defendants, relying upon "pure preemption law,"[25] assert that the state con-

---

25.  In arguing that state law is inapplicable under "pure preemption law" the bank defendants

seek to distinguish their argument from that of the *Clearfield Trust* doctrine asserted and relied

sumer statutes relied upon by plaintiffs are preempted inasmuch as Congress, in establishing the GSLP, has created and occupies an original, comprehensive and all-encompassing body of law which spells out in exacting detail nearly every aspect of the operation of the program. The lender defendants also emphasize the critical importance of their participation to the success of the GSLP, arguing that it has been Congress' consistent and manifest intent to encourage lender participation and to shield lenders who volunteer to participate in the GSLP from "all risk and liability of every kind." They argue that it is "unthinkable to suppose that Congress, in enacting the GSLP, contemplated that lenders could be subjected to the unlimited risk posed by vicarious liability claims grounded on state consumer law statutes," and contend that the state consumer laws relied upon by plaintiffs are diametrically opposed to, and in conflict with, the congressional policies underlying the GSLP:

> It requires little imagination to conclude that if the courts were to allow such an intrusion by state law into the operation of the GSLP which is entirely a creature of federal law, such action would thoroughly destroy the primary force which drives the GSLP and keeps it alive, namely the willingness of lenders to participate in the program. If lenders who volunteer to commit their investors' funds to guaranteed student loans were subject to the vagaries of vicarious liability actions based upon the misconduct of persons over whom lenders have no control, the machinery of the GSLP would quickly come to a grinding halt.

*See* Brief of Charleston National, et. al., at pp. 25–26. *See also* pp. 26–27.[26] They continue:

> As Congress sought to make the GSLP as attractive as possible to lenders, it acted, again and again, to remove all administrative burdens from the lenders, to guarantee them a reasonable profit in return for their dedication of funds to the GSLP, and to *shield them from all risks.* 1972 U.S.Code Cong. & Admin.News, 2488, 1976 U.S.Code Congr. & Admin.News, 4734. As early as 1980, both the House and the Senate had reached the point where they viewed the GSLP entirely as a "national program," 1980 U.S.Code Cong. & Admin.News, 3177, in which the lenders' role was to maintain an ever-increasing flow of funds to the program and to "confine themselves to making lending decisions and leave educational decisions to students, their families and institutions of post-secondary education." *Id.* at 3178.

Brief of Charleston National Bank at pp. 24–25 (emphasis in original).

In this action, the plaintiffs do not dispute the extensive federal statutory and regulatory framework within which the GSLP functions, noting repeatedly that the program takes place within "a highly regulated environment where every action relating to the extension of guaranteed student loans taken by Northeastern Business College and banks was orchestrated by HEAF and the Secretary and where every action taken by HEAF was supervised by the Secretary." Amended Complaint at ¶ 19. The plaintiffs argue, however, that the highly-regulated nature of the GSLP does

---

upon by HEAF. *See Clearfield Trust v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). In *Clearfield Trust,* the Supreme Court held that federal law governs questions concerning the rights of the federal government under federal programs and that, in the absence of an act of Congress applicable to the functioning of such programs, it is for the federal courts to fashion an appropriate and governing rule of law according to their own standards. *Id.* at 366–67, 63 S.Ct. at 574–75. *See* discussion, *infra* at pp. 563–565.

**26.** The lender defendants assert that there have been repeated efforts by some factions to re-

quire lenders to share at least some portion of the risk involved in loans issued under the GSLP in order to mitigate the tremendous cost of the program to the federal government. They contend, however, that "Congress has consistently rejected such suggestions, and continues to do so even today." *See* Brief of Charleston National, et. al., citing 1976 U.S.Code Cong. & Admin.News 4734; and citing, Testimony of Franklin Frazier, U.S. General Accounting Office, before the Subcommittee on Permanent Investigations, Committee on Govt'l Affairs, U.S. Senate, Feb. 1990.

not warrant a finding of preemption of state law defenses inasmuch as 20 U.S.C. § 1087 pertaining to discharge of a GSLP loan in cases of death, disability, or bankruptcy are not to be construed as the exclusive circumstances in which a loan may be unenforceable and properly discharged. Moreover, they contend that there is no sound basis upon which to conclude that the HEA preempts state statutory consumer laws which subject lenders having a close connection to the participating school to a student's school related defenses under either "pure preemption law" or the *Clearfield Trust* doctrine.

The Secretary has taken the same general view as that espoused by the plaintiffs on the preemption issue and has asserted, here and elsewhere, that, although Congress has given the Department of Education the authority to issue regulations which preempt state law, "generally, ... such preemption in the area of borrower defenses is not necessary to accomplish the objectives of the Guaranteed Student Loan Program." *See* Reply Brief of Secretary, at pp. 5–6.[27] In this regard, the Secretary has consistently taken the position that rendering GSLP lenders with a close connection to the participating school subject to state law claims and defenses is not inconsistent with the federal interests underlying the HEA, and will not hinder lender participation in the student loan program. *See* Brief of Secretary filed in *Tipton v. Northeastern Business College*, Civil Action No. 2:86–1280. *See also,* Brief of Secretary filed in *Veal v. First America Savings Bank*, 914 F.2d 909, 911 (7th Cir. 1990).[28] The Secretary posed the following argument during the course of the *Veal* litigation:

The HEA simply does not attempt to itemize or limit borrower defenses on GSLP loans; to the contrary, the seminal requirement that the loan agreement be an "enforceable obligation under applicable law," implicitly disavows any congressional attempt to "leave no room for State regulation." Therefore, neither the adoption of three specific discharge provisions in § 477 nor the administrative sanctions listed later by the district court demonstrate the kind of comprehensive regulation of borrower's rights and remedies on GSLP loans as to "occupy the field" and leave "no room for supplementary State regulation."

*See* Exh. E to plaintiffs' brief in opposition to the defendants' motions to dismiss.

■ Inasmuch as the parties in this action do not argue that the HEA expressly preempts state law in the area of borrower defenses, resolution of the preemption question under well-established Supreme Court precedent turns first upon whether, from the scheme of federal regulation, it can be inferred that Congress intended to "leave no room" for supplementary state regulation. If it cannot be so inferred, the court must then undertake to consider whether state based defenses to the enforceability of a GSLP loan, and the applicability of W.Va.Code § 46A–2–103(a)(2)(A) pertaining to the availability of those defenses against lenders "connected with" the transaction, are preempted as being in conflict with the HEA.

(1) Whether the scheme of the HEA is sufficiently comprehensive as to raise the inference that Congress intended to preempt state law.

In making this determination, the court finds that a review of the provisions of the Act itself are strongly indicative of con-

---

**27.** The Secretary has taken the position that one portion of West Virginia's consumer protection statute, § 46A–2–103(a)(2) is preempted by the HEA, namely § 46A–2–103(1)(a)(v) which subjects a lender to a buyer's claims when the subject purchase was conditioned upon the purchase of goods or services from a particular seller, arguing that application of that provision would interfere with the congressional objectives underlying the Act. *See* Reply of Secretary, at pp. 7, citing *Fidelity Federal Savings and*

*Loan v. De la Cuesta,* 458 U.S. 141, 156, 102 S.Ct. 3014, 3024, 73 L.Ed.2d 664 (1982). The Secretary apparently takes the position that none of the other provisions within the state statute are preempted.

**28.** The Secretary's appellate brief in *Veal v. First American Savings Bank* is attached to the plaintiffs' brief in opposition to the defendants' motions to dismiss in this case.

gressional intent not to preempt the applicability of state law as it pertains to the validity and enforceability of a student's loan obligation and borrower defenses thereto. Indeed, the Act expressly provides in § 1077(a) that a loan will be insurable by the Secretary only if:

> (2) evidenced by a note or other written agreement which—
>> (A) is made without security and without endorsement, except that if the borrower is a minor and such note or other written agreement executed by the borrower would not, under the applicable law, create a binding obligation, endorsement may be required.

20 U.S.C. § 1077(a)(2)(A).

Congress' statutory reference to a binding obligation under the applicable law within this provision implicitly embraces state law as it pertains to the underlying enforceability of loan obligations under the GSLP and negates any inference that Congress intended to stake out the entire field and leave no room for supplementary state laws. Indeed, the only law "applicable" to similar loan transactions when the HEA was enacted in 1965 was state law. Consequently, any construction of the language of § 1077 which denies the applicability of state law as it pertains to the enforceability of the promissory note which is central to the federal insurability of GSLP loans would render Congress' plain choice of words meaningless.

That Congress has also acted to expressly preempt other areas of state law pertaining to a GSLP loan obligation is also persuasive evidence that it did not and does not intend to preempt state law as it pertains to the enforceability of a loan and the area of borrower defenses. For example, Congress has manifested its express intent to preempt state law regulation regarding borrower-lender transactions in the follow-

ing specific instances: state disclosure requirements, 20 U.S.C. § 1099; state-based statutes of limitations and collection expense laws, 20 U.S.C. § 1091(a) & (b); and state usury laws, 20 U.S.C. § 1078(d). Perhaps most telling, in 1986, Congress acted to preempt only one type of state law defense, that of infancy, to the enforceability of GSLP loans. *See* 20 U.S.C. § 1091a(b)(1) & (2) (1986).[29]

Importantly, however, although Congress has not completely displaced state law, federal law may nonetheless preempt state law "to the extent it actually conflicts with federal law." *California v. Guerra*, 479 U.S. 272, 280–81, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). In making this determination, the relevant inquiries are (1) whether compliance with both federal and state regulations is impossible, *Guerra*, 479 U.S. at 280–81, 107 S.Ct. at 688–89, and (2) whether state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* *See also California v. ARC America Corp.*, 490 U.S. 93, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989).

(2) Whether state law conflicts with federal law on the basis that compliance with both federal and state regulations is an impossibility.

a. *Exclusivity of Discharge Remedy*

As to the availability of state law defenses against the enforceability of GSLP loan obligations generally, the bank defendants and HEAF contend, in essence, that Congress has precisely stated those remedies available to a borrower under the GSLP, and that, no matter how deficient the underlying obligation would be under state law, a student's loan obligation may be forgiven only in cases of death, disability,

---

**29.** The statute provides:

> (b) *Assessment of costs and other charges*
>
> Notwithstanding any provision of State law to the contrary—
>
> (1) a borrower who has defaulted on a loan made under this subchapter and part C of subchapter I of chapter 34 of Title 42 shall be required to pay, in addition to other charges specified in this subchapter and part C of

subchapter I of chapter 34 of Title 42, reasonable collection costs; and

> (2) in collecting any obligation arising from a loan made under part B of this subchapter, a guaranty agency or the Secretary shall not be subject to a defense raised by any borrower based on a claim of infancy.

20 U.S.C. § 1091a(b)(1) & (2).

or discharge in bankruptcy. *See, e.g.,* Brief of HEAF, p. 22. The statutory provision upon which they rely states:

(a) *Repayment in full*

If a student borrower who has received a loan described in subparagraph (A) or (B) of section 1078(a)(1) of this title dies or becomes permanently disabled (as determined in accordance with regulations of the Secretary), then the Secretary shall discharge the borrower's liability on the loan by repaying the amount owed on the loan.

(b) *Repayment of amount discharged*

If a student borrower who has received a loan described in subparagraph (A) or (B) of section 1078(a)(1) of this title is relieved of his obligation to repay such loan, in whole or in part, through a discharge in bankruptcy, the Secretary shall repay the amount of the loan so discharged.

20 U.S.C. § 1087(a) & (b).

Based upon the argument that Congress has precisely stated those remedies available to a borrower under the GSLP within the confines of this provision, HEAF and the bank defendants assert that state-based common law defenses including, *inter alia,* inadequacy of educational services and lack of consideration, cannot furnish a proper basis upon which a defaulting student may avoid repayment of his GSLP loan obligation.

Whether state based common law defenses to the enforceability of a guaranteed student loan are preempted by the HEA and implementing regulations was recently considered in *Graham v. Security Savings & Loan,* 125 F.R.D. 687 (N.D.Ind.1989), *aff'd, Veal v. Savings Bank,* 914 F.2d 909 (7th Cir.1990). Under factual circumstances nearly identical to the case at bar, the *Graham* court held that federal law preempts the rights of business students to rescind their student loans on the basis of allegedly fraudulent misrepresentations made to them by the representatives of the college.

In *Graham,* the named plaintiffs initiated a class action on behalf of students who had enrolled at Adelphi Business College in Gary, Indiana, and who received guaranteed student loans from a private lending institution. The plaintiffs alleged that Adelphi representatives had made fraudulent oral misrepresentations regarding the school's classes, teachers, programs, and placement opportunities. Ultimately, and prior to satisfaction of the students' loan obligations, Adelphi filed for bankruptcy and ceased its operations. 125 F.R.D. 687, 689.

Although the thrust of the *Graham* plaintiffs' arguments was directed toward Adelphi, the school was not a named defendant in the action. Rather, plaintiffs brought suit against the private lender, certain holders of the notes, HEAF as insurer, and the United States as guarantor. The plaintiffs theorized, like the plaintiffs here, that "these defendants were closely connected by a mutually beneficial, continuous business arrangement," which they contended "subjects the defendants to claims and defenses that the plaintiffs could assert against Adelphi." 125 F.R.D. at 689.

In resolving the students' claims, the *Graham* district court held that the state law remedy of rescission sought by the plaintiffs as against the lenders, holders, guarantor and insurer was preempted inasmuch as federal law provides for the discharge of their loans "only if the borrower dies, becomes permanently and completely disabled, or is relieved of his obligation to repay such a loan by a discharge in bankruptcy." 125 F.R.D. at 692, citing 20 U.S.C. § 1087(a), (b), and 34 C.F.R. § 682.-102(c). The *Graham* court stated:

There is no dispute that the plaintiffs received guaranteed student loans to help finance their education through the guaranteed student loan program which is governed by the Higher Education Act. They now seek to have their loans rescinded on the basis of a violation of state and federal law. It is true that federal law governs the remedies available upon default of federally held loans. The application of federal law to remedies upon default of these federal loans is warranted by the "overriding federal

interests in protecting the funds of the United States and securing federal investments." Since there is a detailed and extensive body of federal law governing the guaranteed student loan program pursuant to 20 U.S.C. § 1071 *et seq.* and their regulations issued pursuant to 34 C.F.R. § 682 *et seq.*, federal law governs these remedies upon default of these guaranteed student loans and rescission based on fraud is not a permissible remedy.

125 F.R.D. at 692 (citations and footnote omitted).[30]

After determining that plaintiffs' state law claims were preempted by the HEA and implementing regulations, the *Graham* court proceeded to hold that, even assuming federal law did not preempt state law, the plaintiffs had failed to allege any fraudulent activity on the part of any of the named defendants, and had not alleged that any of the named defendants had any knowledge or reason to know of any alleged fraud by the school.[31]

On appeal of the *Graham* decision, the Seventh Circuit recognized, in *Veal v. First American Savings Bank,* that the district court's dismissal of the students' cause of action had been predicated on three separate grounds: (1) on the basis that the plaintiffs failed to state a claim against the named defendants on the fraud and "close connection" argument; (2) on the basis that the remedies under the HEA were limited to those enumerated in the statute; and (3) on the basis that the HEA preempted the students' state law remedies. 914 F.2d at 911. In affirming the district court's decision, however, the appellate court did so on the first ground only, expressly declining to affirm the district court's decision on the preemption issue and on the issue of whether the remedies enumerated within the HEA are exclusive. *Id.*

Importantly, however, the Seventh Circuit unequivocally stated in its last footnote to the *Veal* opinion that "if sued by a Lender in state court for collection of one of these loans, each of these plaintiff students would be entitled to assert any defenses available under state law that are applicable to his or her particular loan." 914 F.2d at 914–15, n. 7. Thus, the Seventh Circuit indicated rather unambiguously its position that state based defenses to the underlying loan obligation itself would not be preempted.

Like the *Veal* court, this court is unable to conclude that, by setting forth certain enumerated circumstances in which a GSLP loan obligation may be discharged, Congress intended to infer preemption of any other state based defenses to the valid-

---

**30.** The *Graham* court further opined that, under standard preemption analysis, the federal law embodied in the HEA was sufficiently "comprehensive regarding obligations, rights and remedies" to infer congressional intent to leave no room for supplemental state regulation, and determined that a *state law claim for rescission would also conflict with federal objectives. Id.* at 693 at n. 7.

The court based its conclusion in this regard upon the determination that rescission would conflict with federal objectives inasmuch as it would "discourage future participation in the GSL program by lenders and thwart Congress' intent 'to increase loan availability by making the [GSL] Program more attractive to commercial lenders.'" 125 F.R.D. at 693, citing 1980 U.S. Code Congressional and Administrative News, p. 3168.

**31.** The *Graham* district court also concluded that an assignee is not liable, pursuant to 20 U.S.C. § 1082(g)(5) *for a violation of the HEA* by others. 125 F.R.D. at 693. It is noted, however, that 20 U.S.C. § 1082(g) relied upon by the court for that premise pertains only to the *Sec-*

*retary's* power to impose civil penalties upon a lender or guarantee agency who, it is determined, "has violated or failed to carry out any provision of this part or any regulation prescribed by this part," or "has engaged in substantial misrepresentation of the nature of its finance charges."

Subsection (g)(5) of 20 U.S.C. § 1082 referred to by the *Graham* court provides:

If a loan affected by a violation, failure, or substantial misrepresentation is assigned to another holder, the lender or guarantee agency responsible for the violation, failure, or substantial misrepresentation shall remain liable for any civil money penalty ... but the assignee shall not be liable for any such civil money penalty.

20 U.S.C. § 1082(g)(5). This court does not read the provision relied upon by the *Graham* court to stand for the proposition that assignees of the original lender may not be subject to the defenses which the student would have against the enforceability of the loan.

ity and enforceability of the underlying loan obligation. Indeed, given Congress express reference to a binding obligation under the applicable law in 20 U.S.C. § 1077 as a condition precedent to governmental insurability of a GSLP loan, it seems rather apparent that the overall scheme of the HEA presupposes the existence of a validly enforceable loan obligation under state law notwithstanding the extensive regulatory framework within which the program functions.

In *American Bank of San Antonio v. United States*, the United States Court of Claims recognized the fundamental prerequisite of a valid and enforceable loan obligation as a condition precedent to the effective functioning of the student loan program. 633 F.2d 543, 224 Ct.Cl. 482 (1980). In that case, the court noted that a lender's use of altered promissory notes and application forms would render the instrument unenforceable under general legal principles and would be inconsistent with "the government's legitimate request for a fully enforceable contract on which to recoup its losses." 633 F.2d at 548. The court stated:

> The government's right of subrogation contemplates that the bank's assigned claim against the student will be valid to the extent that it is enforceable on its face. Unless the bank's claim against the student is enforceable at the time of assignment, the subrogation rights the government receives in exchange for the insurance payments would be worthless. One of the basic responsibilities placed on lenders is to use reasonable care in conducting their part of the program. A major reason for this requirement is to protect the financial integrity of the program by minimizing the potential governmental liability under it. Lender practices that diminish the enforceability of the promissory notes increase the government's losses as insurer by limiting its ability to collect from the defaulting students.

633 F.2d at 547 (citations omitted).

It is noted that several other courts have, in collection actions brought by the Secretary against defaulting students, rejected state law defenses such as lack of consideration and inadequate educational services asserted by students to avoid repayment of their GSLP debts. *United States v. Olavarrieta*, 632 F.Supp. 895, 902 (S.D.Fla. 1986), *aff'd*, 812 F.2d 640 (11th Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987); *United States v. Whitesell*, 563 F.Supp. 1355 n. 1 (D.S.D.1983); *United States v. Lujan*, 520 F.Supp. 282, 283 (D.N.M.1980). None of those decisions, however, were premised as a matter of law upon a finding of state law preemption, but rather were decided upon their own individual facts and circumstances. *See Olavarrieta*, 632 F.Supp. at 902 (no lack of consideration where debtor received educational benefits from loan proceeds); *Whitesell*, 563 F.Supp. at 1355 n. 1 (claimed of lack of consideration "meritless and frivolous"); *Lujan*, 520 F.Supp. at 283 (no lack of consideration where loan proceeds "applied directly to pay the tuition of a course of study").

Congress' reference to a binding obligation under the applicable law within 20 U.S.C. § 1077 clearly supports the conclusion that the existence of state law defenses to the enforceability of a student's loan obligation does not conflict with the statutory provisions of the HEA, but is instead indicative of congressional recognition that the underlying loan obligation must itself be an enforceable one under state law. Moreover, the court finds that Congress' enumeration of three specific instances in which an otherwise validly enforceable loan may be discharged does not warrant the inference that Congress intended to implicitly preempt all other state law defenses to enforceability of a GSLP loan.

b. *Lender Liability for School Related Defenses*

Having concluded that the state law defenses to the enforceability of a GSLP loan are not implicitly preempted by the existence of a discharge remedy in the case of death, disability or discharge in bankruptcy, the court must next consider whether the statutory basis asserted by the plaintiffs to subject the lenders to those defens-

es is preempted as being in conflict with the Act or its objectives.

In reviewing the West Virginia consumer statute relied upon by plaintiffs, the court finds that, with the exception of subparts (iv) and (v) of W.Va.Code § 46A–2–103(1)(a), none of the bases upon which a lender may be held subject to the defenses of a buyer under state law would appear to conflict with federal law embodied in the HEA to the extent that "compliance with both federal and state regulations is a physical impossibility." *Guerra,* 479 U.S. at 280–81, 107 S.Ct. at 689. Application of subparts (iv) and (v) of § 46A–2–103(1)(a) would, however, appear to be preempted by the HEA inasmuch as compliance with the mandates of the federal act and regulations would, perforce, automatically render a lender subject to a student's defenses under state law even in cases in which a close relationship between the lender and school is not otherwise present. Specifically, subpart (iv) of 46A–2–103(1)(a) would render a participating lender subject to a student's defenses if the lender directly provides the school, or the school provides the lender, with the documents used by the borrower to evidence the transaction, an action which is a required element of the HEA. *See* 20 U.S.C. § 1078(a)(2)(A).[32] Similarly, subpart (v) of § 46A–2–103(1)(a) would render a participating lender subject to a student's defenses any time the student's loan "is conditioned upon the borrower's purchase of the ... services from a particular seller," an action which is a requisite element of the HEA, 20 U.S.C. § 1078(a)(2).[33]

Consequently, plaintiff's cause of action against the bank defendants must fail to the extent that it is predicated on an assertedly close connection with NBC, which connection allegedly results from actions taken by the banks which are expressly dictated by the terms of the federal act and regulations. *See* W.Va Code § 46A–2–103(1)(a)(iv) and § 46A–2–103(1)(a)(v).

Not preempted, however, is plaintiffs' cause of action against the defendant Charleston National Bank under W.Va. Code § 46A–2–103(1)(a)(i), inasmuch as that defendant allegedly paid to NBC finders fees for GSLP loans issued by that institution.[34] Nor is plaintiffs' cause of action preempted against the other bank defendants under the remaining portion of the statute which is applicable to plaintiffs' allegations, namely § 46A–2–103(1)(a)(vi), inasmuch as plaintiffs have alleged the existence of "business arrangements" between such banks and NBC, and inasmuch as plaintiffs contend that NBC "routinely referred" prospective students to those banks. *See* Amended Complaint, ¶¶ 151, 152.

### c. *HEAF Liability under the West Virginia statute*

HEAF argues that, even if West Virginia law is not preempted, the plaintiffs have still failed to state a claim against HEAF under the state consumer statute at issue, W.Va.Code § 46A–2–103, inasmuch as there is no allegation in the amended complaint that plaintiffs have preserved their

**32.** Although 20 U.S.C. § 1078(a)(2)(A) does not prohibit a lender from or require a lender to supply a school directly with documents used to evidence the loan transaction, the provision does clearly indicate a direct transmittal of documents central to the loan process between the school and lender:

(2) Additional requirements to receive subsidy

   (A) Each student qualifying for a portion of an interest payment under paragraph (1) shall—

     (1) have provided to the lender a statement from the eligible institution, at which the student has been accepted for enrollment, or at which the student is in attendance, which

      (I) sets forth such student's estimated cost of attendance ...

      (II) sets forth such student's estimated financial assistance; and

      (III) sets forth a schedule for disbursement of the proceeds of the loan in installments, consistent with the requirements of section 1078–7 of this title ...

20 U.S.C. § 1078(a)(2)(A).

**33.** The GSLP loan transaction process is fundamentally conditioned upon the receipt of loan funds to be utilized by the student in attending school at a particular institution which must be "eligible" within the meaning of the Act and regulations.

**34.** The court is aware of no other defendant bank which allegedly paid such fees to NBC.

claims and defenses against HEAF.[35] In this regard, HEAF contends that the consumer debtor must provide to the holder, assignee or lender a notice of claims and defenses arising from a specific consumer sale, and that, without such notice of claims and defenses having been given to HEAF, it has taken the subject notes free of the students' claims and defenses. *See* Brief of HEAF at p. 35, n. 16.

In resolving this argument, it is observed that the West Virginia Consumer Protection Act in question became effective on September 1, 1974. *See* W.Va.Code § 46A-8-101(1). Each of the three code sections, W.Va.Code § 46A-2-101 through § 46A-2-103, pertaining to the conditions under which a holder, assignee, and lender will be subject to a consumer borrower's claims and defenses, originally contained a prefatory subsection which set forth that the consumer must have given a 180 day notice to a holder, assignee or lender in order to subject any one of those entities to the consumer's claims and defenses. *See* W.Va.Code §§ 46A-2-101(1), 46A-2-102(1), and 46A-2-103(1). However, the express provisions of each of those subsections clearly provides that such notice was a necessary predicate to holder, assignee or lender liability only during the Act's one year phase-in period.

For example, § 46A-2-103(1) pertaining to lender liability specifically states:

(1) The following limitations shall be applicable to claims and defenses of borrowers, arising from consumer sales, with respect to consumer loans made on the date this chapter becomes operative or within a period of one year thereafter.

(a) A lender ... who, with respect to a particular transaction, makes a consumer loan ... is subject to all claims and defenses of the borrower against the seller arising from that specific sale of goods or services if such lender participates in or is connected with the sales transaction, and if such claims and defenses are asserted by the borrower by written notice given to the lender within a period of one hundred eighty days after the lender has delivered or mailed to the borrower a written notice complying with the requirements of subdivision (b) of this subsection (1).

W.Va.Code § 46A-2-103(1).[36] Thus, during the one year phase-in period, subsection (1)(a) did, in fact, require the notice referenced by HEAF. By its own terms, however, the Act specifically restricted the applicability of (1)(a) to loans "made on the date [the] chapter be[came] operative *or within a period of one year thereafter.*" W.Va.Code § 46A-2-103(1)(a).[37]

Subsection (2) of § 46A-2-103, the provision which is applicable to claims and defenses of borrowers on consumer loans "made after the expiration of one year after the date this chapter becomes effective," does not contain any such notice requirements and, in fact, provides that a

---

**35.** It is observed that § 46A-2-103 pertains to conditions under which a lender will be subject to a borrower's defenses arising out of a consumer sale, and that, by statute, "lender" includes assignees of the lender. *See* W.Va.Code § 46A-1-102(21). Moreover, W.Va.Code § 46A-2-102 provides that assignees of instruments and contracts other than negotiable instruments evidencing consumer sales obligations may be held subject to consumer defenses arising from such a sale. HEAF does not argue that the notes in question are negotiable instruments, nor that it is entitled to any protection from consumer defenses as a holder in due course.

**36.** Pursuant to subsection (b)(1), the lender or assignee must first have given written notice to the consumer "in a conspicuous manner" that he or she would have 180 days within which to notify the holder, lender or assignee in writing

of any claims or defenses which he might have arising from the consumer sale at issue, and that failure to do so would result in the holder, lender or assignee having the right to enforce the instrument free of any such claims or defenses. If the consumer did not provide the holder, lender or assignee with such notice of claims and defenses after having been so advised in writing by the lender or assignee, then his or her consumer obligations could be enforced notwithstanding the existence of such claims and defenses. *See* W.Va.Code § 46A-2-101(1)(b); § 46A-2-102(1)(b); § 46A-2-103(1)(b).

**37.** Thus, the 180-day notice was required in order to preserve consumer defenses only for consumer loans transacted between the period beginning September 1, 1974, the Act's effective date, and running through August 31, 1975.

lender will be subject to all claims and defenses of the borrower against the seller if the lender "participates in or is connected with the sales transaction ... without regard to the provisions therein as to notices." *See* W.Va.Code § 46A–2–103(2).[38]

Having thus found HEAF's notice argument unavailing, the court next considers the argument posed by both HEAF and the bank defendants that the state consumer statute should be found preempted in its entirety as being in conflict with the congressional purposes and objectives underlying the guaranteed student loan program.

(3) Whether state law conflicts with federal law on the basis that it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Both the bank defendants and HEAF contend that preemption of the state consumer protection statutes upon which plaintiffs rely to subject the banks and their assignees to the students' claims and defenses is necessary to fulfillment of the congressional objectives underlying the HEA, namely, lender participation. HEAF points out that it is required by federal law to "encourage maximum commercial lender participation" in the GSLP, 20 U.S.C. § 1072(c)(6)(B); 34 C.F.R. § 682.-403(a)(2)(iii)(B), and contends that this obligation and Congress' intent will be frustrated "if lenders or their assignees are held to be subject to every claim or defense a disgruntled student might have against the school."[39]

Similarly, the bank defendants contend that lender participation will be thwarted if the state consumer laws relied upon by the plaintiffs are not preempted, and assert that such a result would be inconsistent with congressional intent to shield lenders "from all risk and liability of every kind." *See, e.g.,* Brief of Charleston National Bank at p. 27.

Maximal lender participation is inarguably critical to the successful functioning of the guaranteed student loan program. The court finds, however, no clear basis upon which to conclude that, by encouraging maximum lender participation in the GSLP, Congress intended for lenders with a close connection to a participating school to be absolutely shielded from liability when a student's loan obligation has been tainted by misconduct on the part of that school sufficient to adversely affect the enforceability of the student's loan. Indeed, the provisions of the Act and implementing regulations provide persuasive evidence to the contrary inasmuch as Congress has noted that federal insurability on such loans is contingent upon the existence of a binding obligation under the applicable law, *see* 20 U.S.C. § 1077(a)(2)(A), has expressly placed upon lenders not only the duty to exercise "reasonable care and diligence" in the collection of loans under the GSLP, but also to exercise such care and diligence in the "making" of such loans as well, *see* 20 U.S.C. § 1080(d) (1986), and inasmuch further as the Secretary's regulations have unambiguously required due diligence on the part of lenders in the "making, servicing and collection" of GSLP loans. *See* 34 C.F.R. § 682.200, 34 C.F.R. § 682.401(b)(9) (1986).

It is noted that portions of the legislative history of the GSLP relied upon by the bank defendants reflect that, in 1976, one committee which studied the GSLP scheme expressed dismay that some lenders demonstrated a propensity "to make educational decisions and judgments about who can or ought to benefit from what kind of

**38.** In 1990, West Virginia's legislature amended § 46A–2–102 & 103 to specifically omit subsection (1) which had long since become ineffective. The legislature has yet to consider and amend the outdated language pertaining to notice in § 46A–2–101.

**39.** HEAF further asserts that, "if lenders, secondary markets and guaranty agencies are in fact confronted with such open-ended risk in a

program of the nature of the GSLP, these entities will simply decline to participate. For lenders especially, the rewards of the GSLP will not justify the risk. The GSLP will no longer have its infusion of private capital to advance the costs of students' educations and the Congressional objectives sought to be achieved by the GSLP will be defeated." Brief of HEAF, pp. 25–26.

postsecondary education." *See* Committee Reports, P.L. 96–374, at 38, *reprinted in* 1980 U.S.Code Cong. & Admin.News at 3178. In response to this noted practice, the Committee opined that "lenders ought to confine themselves to making lending decisions and leave educational decisions to students, their families and institutions of postsecondary education." *Id.* The court concludes, however, that the legislative history cited by the bank defendants cannot be stretched so far as to infer an intent on the part of Congress to absolutely shield lenders from any and all responsibility for unenforceable loan obligations even when their conduct may have contributed in some way to the unenforceability of that obligation. Quite simply, Congress' intent to foster responsible lender involvement in the GSLP is not indicative of an intent to allow lenders to affirmatively seek to participate in the GSLP by, for example, paying "finders fees" to participating schools, while at the same time closing their eyes to public allegations of impropriety on the part of those schools to whom the lender is paying such fees.[40]

In *United States v. Griffin,* a case arising under FISLP rather than under the guaranty agency portion of the GSLP, the plaintiff defaulted on a federally insured student loan obtained to attend a radio and television repair course at a proprietary vocational school. 707 F.2d 1477 (D.C.Cir. 1983).[41] Prior to litigation by the government to collect on the note, the student advised the school's collection agency that he believed he had valid defenses which excused him from his repayment obligations to the school's lender.

Despite the fact that the collection agency had informed the student's attorney that "[i]f the debtors you represent can prove a defense on the debt, we will pursue the matter with the lender, which has warranted to us that the note qualifies for payment on the federal loan insurance," the government filed suit against the student in district court to recover the balance due on the defaulted loan.[42] Without expressing any view as to whether the student's defenses were valid, the D.C. Circuit held that the student was entitled to raise them and, accordingly, reversed the district court's grant of summary judgment in favor of the government.

Although not facing the preemption question squarely, the *Griffin* court did consider the government's argument that subjecting it to the student's claims would conflict with the basic policies underlying the HEA, an argument similar to those posed by the lender defendants and HEAF in support of preemption of the state consumer law relied upon by plaintiffs here. The *Griffin* court opined:

> Far from conflicting with the aims of the statute, this policy is a logical outgrowth of the Program's purposes. A policy of recognizing student defenses in no way means that the government will regularly bear losses on these loans. Normally, the government can turn around and recover from the lender default claims paid on obligations not in fact owed. Griffin's case is unusual only because his school has closed, and indeed was closed before the government paid the school's claim. The fact that reimbursement might be difficult or impossible in this particular case, however, does not impugn OE's general policy of letting students raise defenses in suits brought against the government. OE's decision to preserve

---

**40.** Plaintiffs contend that allegations of widespread fraud and inadequate educational programming were central to the *Perry–Alltop* litigation and were a matter of public record as early as 1983 when that suit was filed. *Perry–Alltop, et al. v. Northeastern Business College, Inc., et al.,* Civil Action No. 83–C–254.

**41.** It is noted that in *Griffin,* the school actually originated the loan and was the original lender in the transaction. After default, the school submitted a claim to the Office of Education for reimbursement of its losses on the loan and, at

the same time, assigned all its rights in the note to the government directly. Thus, the issue was not whether a private lender or guaranty agency was subject to the student's defenses but whether the federal government itself would be.

**42.** Defenses raised by the student at the district court level included allegations of school inadequacies: "breach of contract, illegal contract, and fraud or violation of District of Columbia consumer protection rules." 707 F.2d at 1480.

defenses seems a sound way to protect the interests of student borrowers and to deter lenders from abusing the program. *Id.* at 1482–83.

It is noted that the *Griffin* court's holding that the student could raise his defenses against the government was based in large measure upon an Office of Education regulation within the FISLP portion of the program which the court found "unambiguously bars the agency from collecting against a student who has a valid defense on the loan." 707 F.2d at 1481.[43] The regulatory provision relied upon by the *Griffin* court, codified at 34 C.F.R. § 682.-518, states:

> After paying a default claim on a FISLP loan, the Secretary attempts to collect from the borrower and any valid endorser in accordance with the Federal Claims Collection Standards. The Secretary attempts collection of all unpaid principal and accrued interest, except in the following situations:
>
> > (a) The borrower has a valid defense on the loan. In this situation the Secretary refrains from collection against the borrower or endorser to the extent of any defense that either may have.

34 C.F.R. § 682.518 (1982).

There was, at the time of the loans at issue here, apparently no provision within the guaranty agency program regulations which so clearly enunciated the Secretary's position that GSLP loan obligations were subject to defenses under applicable law, including state law. Consequently, HEAF and the bank defendants argue that *Griffin*, which arose under FISLP in which the government directly insures the lender's loans, has no applicability to this action.

The Secretary has asserted, however, and his regulatory amendments subsequent to the period of time at issue make it manifestly clear in both the FISLP and guaranty agency portion of the GSLP, that the lender must obtain from the borrower an executed, "legally enforceable" promissory note as proof of the student's indebtedness. *See* 34 C.F.R. § 682.206(d)(1); 34 C.F.R. 682.513(a)(2) (1987). The provision specifically applicable to the guaranty agency facet of the GSLP—34 C.F.R. § 682.206(d)(1)—although promulgated by the Secretary and included within the GSLP regulations after the loans in this case were transacted, is not perceived by the court as creating a novel approach to lender obligations under the GSLP but rather undertook to clarify the obligations placed upon lenders by force of the HEA itself: that of exercising reasonable care and diligence in the making, servicing and collecting of GSLP loans, 20 U.S.C. § 1080(d), and of obtaining a "binding obligation under the applicable law" as implicitly required by 20 U.S.C. § 1077(a)(2)(A) in order to be protected by federal insurability.

As the D.C. Circuit clearly recognized in *Griffin*, and as the Secretary has consistently maintained, there are sound policy reasons for rendering lenders with a close connection to a participating school subject to the claims and defenses which a student would have against the school on the enforceability of their loan obligation. The Secretary has persuasively argued:

> [T]he HEA itself articulates its acceptance of State law as posing no general obstacle to the achievement of GSLP objectives, and the protection of Federal interests, by providing that the government's guarantee and attendant subsidies are payable only on a loan that is an "enforceable obligation under applicable law."
>
> .... If State law defenses were preempted by the HEA, this seminal requirement is rendered meaningless. If state law does not stand as a potential source of defenses to repayment, all

---

**43.** From its inception until May 4, 1980, the GSLP was administered by the Office of Education of the Department of Health, Education and Welfare. Pursuant to § 601 of The Department of Education Organization Act, Pub.L. No. 96–88, Title VI, 93 Stat. 696 (1980), the Office of Education was reorganized and the Department of Education was created. In the process, the administration of GSLP was transferred to the Secretary of Education. *See Griffin*, 707 F.2d at 1488, n. 1. *Griffin's* reference to the Office of Education stems from the fact that that entity was "in charge" during most of the events relative to its appellate decision. *Id.*

loans are necessarily, and by strength of Federal law, enforceable against the borrower, regardless of the culpability or misconduct of the lender or subsequent holder. This conclusion, while of obvious benefit to the lender, would provide little benefit to the Federal government, which would be required to honor guarantee claims by lenders on loans tainted by misconduct deemed serious enough to bar their enforcement if they were contracts between private parties, while incurring the burden of attempting collection precisely against those borrowers who have most reason to resist repayment.

*See* Brief of Secretary filed in *Veal v. First American Savings Bank.*[44]

Importantly, the United States Supreme Court has held that "the interpretation of an agency responsible for administering a federal program and issuing regulations thereunder is entitled to considerable deference." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). In *Red Lion*, the Court noted that the construction of a statute by those charged with its execution should be followed "unless there are compelling indications that it is wrong." *Id.* at 381, 89 S.Ct. at 1801. Here, the court finds no such compelling circumstances upon which to conclude that the Secretary's position on the preemption issue is incorrect.

If, in an effort to further lender participation in the GSLP program, Congress sees fit to assure lenders that they will receive payment of federal loan subsidies despite the fact the loans upon which they make their subsidy claims would be legally unenforceable obligations under ordinary state consumer contract laws, it may clearly undertake to do so. However, in the absence of Congressional enactment indicative of a desire to completely preempt state law defenses to the enforceability of GSLP

loan obligations, and in the face of regulatory pronouncements by the Department of Education which unambiguously embrace state law as it pertains to the validity, enforceability and insurability of GSLP loans, the court finds nothing in the HEA or case law to suggest that Congress has yet manifested such a position. *See, e.g.,* 34 C.F.R. § 402(d)(5) (1987); 34 C.F.R. § 682.405(b) (1986), 34 C.F.R. § 682.410(c) (1987); 34 C.F.R. § 682.411(c) (1987).[45]

## VII.

In concluding that there is no implied preemption of state defenses to the enforceability of GSLP loan obligations, and that only limited portions of the state statutory law relied upon by plaintiffs to subject the bank defendants to the students' school related defenses are preempted, the court has also considered HEAF's arguments that state law cannot be relied upon as a basis for finding it and the banking defendants subject to the students' claims and defenses under the *Clearfield Trust* doctrine. *See Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943).

In *Clearfield Trust*, the United States Supreme Court held that federal law governs questions involving the rights of the United States arising under nationwide federal programs, stating in pertinent part:

When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power.... The authority [to do so] had its origin in the Constitution and the statutes of the United States and was in no way dependent on the law [of any State]. The duties imposed upon the United States and the rights acquired by it ... find their roots in the same federal sources. In absence of an applicable Act of Congress it is for the federal courts to fashion the govern-

---

**44.** Portions of the Secretary's appellate brief in the *Veal* litigation are attached as Appendix E to plaintiffs' memorandum in opposition to the defendants' motions to dismiss in this case.

**45.** Although certain of the regulatory references to state law as it pertains to the enforceability of GSLP loans were promulgated subsequent to the

majority of the loans at issue, Congress' failure in the face of these regulations to expressly preempt state law defenses other than infancy is some indication, slight though it be, that it does not intend for such defenses to be unavailable to an aggrieved student.

ing rule of law according to their own standards.

*Clearfield Trust Co. v. United States,* 318 U.S. 363, 366–67, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943).

More recently, in *United States v. Kimbell,* the Supreme Court emphasized that, pursuant to the principles articulated in *Clearfield Trust,* it has "consistently held that federal law governs questions involved in the rights of the United States arising under national federal programs." 440 U.S. 715, 726–27, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). In light of the rationale followed by the Court in *Kimbell,* HEAF contends that there is no question that federal law applies to the GSLP, but asserts that the central issue is how the court should determine the content of that federal law—i.e., whether it should adopt state law or fashion a national federal rule. Pursuant to *Kimbell,* such determination is said to be "a matter of judicial policy dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law." *Kimbell,* 440 U.S. at 728, 99 S.Ct. at 1458, citing *United States v. Standard Oil,* 332 U.S. 301, 310, 67 S.Ct. 1604, 1609, 91 L.Ed. 2067 (1947). The *Kimbell* Court expressly identified the relevant considerations:

> Undoubtedly, federal programs that "by their nature are and must be uniform in character throughout the Nation" necessitate formulation of controlling federal rules. Conversely, when there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision. Apart from considerations of uniformity, we must also determine whether application of state law would frustrate specific objectives of the programs. If so, we must fashion special rules solicitous of those federal interests. Finally, our choice-of-law inquiry must consider the extent to which application of a federal rule would disrupt commercial relationships predicated on state law.

440 U.S. at 728–29, 99 S.Ct. at 1458–59 (citations and footnote omitted).

Despite the government's assertion in *Kimbell* that compliance with state law would interfere with the need for nationwide uniformity, the Court held, *inter alia,* that incorporation of state law to determine the rights of the United States as against private creditors would in no way hinder the administration of the SBA and FHA loan programs at issue in that case. *Id.* at 729, 99 S.Ct. at 1459. Moreover, finding no indication that variant state priority schemes would burden the methods of loan processing in effect at the time, the *Kimbell* Court concluded that considerations of administrative convenience did not warrant adoption of a uniform federal law. *Id.* The Court also determined, contrary to the government's arguments, that the federal interests were not such that state law should be avoided:

> In structuring financial transactions, businessmen depend on state commercial law to provide the stability essential for reliable evaluation of the risks involved ... Because the ultimate consequences of altering settled commercial practices are so difficult to foresee, we hesitate to create new uncertainties, in the absence of careful legislative deliberation. Of course, formulating special rules to govern the priority of the federal consensual liens in issue here would be justified if necessary to vindicate important national interests. But neither the Government nor the Court of Appeals advanced any concrete reasons for rejecting well-established commercial rules which have proven workable over time. Thus, the prudent course is to adopt the ready made body of state law as the federal rule of decision until Congress strikes a different accommodation.

440 U.S. at 740, 99 S.Ct. at 1464 (citations and footnote omitted).

The court finds in this case that application of the three-part test enunciated in *Kimbell* does not justify avoidance of state based consumer laws which are not otherwise preempted by the federal statutory and regulatory scheme of the HEA. First, despite the nationwide scope of the GSLP, it is implicit in Congress' reference to binding obligation under applicable law in

§ 1077(a)(2)(A) relative to the need for an endorser on loans made to infants, that state law is recognized and embraced as it pertains to the enforceability of GSLP loan obligations. Secondly, and as noted more fully in the court's analysis of the preemption issue, application of state law as it pertains to the area of lender defenses does not appear to frustrate the specific objectives of the federal program. *See* discussion, pp. 560–563. Thirdly, there have been no concrete reasons found by the court to warrant rejection of well-established commercial rules pertaining to the area of consumer defenses which have proven workable over time. Thus, to the extent that the HEA and implementing regulations contain a void in the area of consumer defenses which must be filled either by fashioning a uniform rule of federal law or by resort to existing state law, this court, as did the Supreme Court in *Kimbell*, concludes that the prudent course is to adopt a ready-made body of state law as the federal rule of decision until Congress opts to strike a different accommodation. *See Kimbell*, 440 U.S. at 740, 99 S.Ct. at 1464–65.

## VIII.

■ Although the plaintiffs have stated a valid nonpreempted state law basis upon which the bank defendants, HEAF and the Secretary may be held potentially subject to their school-related defenses, and although this result, standing alone, necessitates the denial of the defendants' motions to dismiss, the court has proceeded to consider plaintiffs' argument that the bank defendants, HEAF and the Secretary are also subject to the students' defenses as a matter of federal law. In this regard, the plaintiffs have asserted that it is and has been the Secretary's policy that a student is responsible for paying off a GSLP loan to a lender even if the school has closed or has engaged in fraud, *"unless* the lender is responsible for school related claims by virtue of some special relationship between a lender and school." *See* Plaintiffs' Brief, at p. 24 (emphasis in original). One such special relationship, plaintiffs' assert, is

when the school has an origination relationship with the lender. *Id.*

According to the Secretary's regulations, an origination relationship is "a special relationship between a school and a lender, in which the lender delegates to the school, or to an entity or individual affiliated with the school, substantial functions or responsibilities normally performed by lenders before making loans." 34 C.F.R. 682.200. The regulations state:

> ... The Secretary determines that "origination" exists if, for example—
>
> (1) A school determines who will receive a loan and the amount of the loan; or
>
> (2) The lender has the school verify the identity of the borrower or complete forms normally completed by the lender.

34 C.F.R. Pt. 682, Subpart B at 682.200(b).

The plaintiffs have pointed to numerous instances, primarily subsequent to the making of loans at issue in this case, in which the Department of Education has articulated its position that an origination relationship between a lender and school will subject the lender to the student's school-related defenses, and its position that where there is an origination relationship and the lender is thus subject to the student's school-related defenses, the Department of Education will not pay the lender on a default claim to the extent of those defenses, will not collect that amount from the student, and will not expect HEAF to collect that amount.

For example, in a May 19, 1988, letter from Kenneth D. Whitehead, the Acting Assistant Secretary of Education, to Stephen J. Solarz, House of Representatives, the Assistant Secretary stated the following regarding the effect of an origination relationship on the GSLP loan process:

> If a loan is not legally enforceable, it is not reinsurable by the Department, and the Department would not encourage or require a lender or guaranty agency to attempt to collect such a loan. As a legal matter, however, a student who borrows under the GSL program from a third party lender remains responsible

for repaying the loan even if the school closes, unless a relationship exists between the lender and school that would make the school's failure to render educational services a defense to repayment of the loans to the lender. This kind of relationship can arise when the lender makes the school its agent for certain functions in the loan making process. The Department has termed such an agency relationship an "origination relationship." 34 C.F.R. 200.

*See* May 19, 1988, letter from Kenneth D. Whitehead, Acting Assistant Secretary of Education, to Honorable Stephen J. Solarz, House of Representatives (hereinafter "Solarz letter") attached as Exhibit 5 to Plaintiffs' Amended Complaint.

The Solarz letter further noted the following regarding those instances in which an origination relationship is found to exist between the school and lender:

> If the court finds that the school acted as an agent of the lenders and determines that the loans, for that reason, are wholly or partially unenforceable against the borrowers, the Department would honor that determination, and would regard these loans, to that extent, as not covered by reinsurance, and would neither attempt to collect them nor expect guaranty agencies to collect them.

*Id.*

In another 1988 letter from Dewey Newman, Deputy Assistant Secretary for Student Financial Assistance, U.S. Department of Education, to the Texas Education Agency Commissioner of Education, the Department reiterated that the existence of an origination relationship between a lender and school would "make the school's failure to render educational services a defense to repayment of the loans to the lender." *See* Appendix C to Plaintiffs' Memorandum (hereinafter "Newman letter").

In May, 1989, the Department of Education further noted in a letter concerning compromise and write-off procedures relative to closed schools that "in the case of a loan that is made or originated by the school, the borrower's right to a refund amount owed by the school constitutes a defense to a corresponding amount of the loan." *See* Compromise & Write–Off Procedures, May, 1989, p. 5, attached as Exhibit 28 to Amended Complaint.

Finally, a 1989 amendment to the Secretary's regulations requires schools to counsel students concerning the ramifications of default, with such disclosures to specifically include a statement that students may not raise school related defenses against lenders "other than a loan made or originated by the school." 34 C.F.R. § 682.604(f)(2)(iii) (1989).[46]

HEAF and the bank defendants contest the plaintiffs' origination relationship argument and point out that nothing in the HEA or regulations have ever made the existence of such a relationship impermissible, *see* 34 C.F.R. § 682.205(e), nor did the guaranty agency portions of the regulations enumerate, at least between 1981 and 1986, the risks which a lender purportedly runs by entering into such a relationship with a participating school. They contend, in essence, that the Secretary's letter-form policy articulations and the 1989 amendatory changes to the GSLP regulations which now apparently undertake to set forth the Secretary's position on the origination relationship issue, can provide no legal basis upon which to hold the lenders subject to the students' school-related defenses. Pointing out that the loans at issue were transacted between 1981 and 1986, the banks and HEAF argue that the Secretary's recent statements regarding the effect of an origination relationship are merely self-serving pronouncements made

---

**46.** 34 C.F.R. § 682.604(f)(2)(iii) provides that prospective borrowers under the GSLP must be advised of the ramifications of taking out a GSLP loan and that "in the case of a student borrower of a GSL ... program loan (other than a loan made or originated by the school)" the student must be informed that he or she is "obligated to repay the full amount of the loan even if the borrower does not complete the program, is unable to obtain employment upon completion, or is otherwise dissatisfied with or does not receive the educational or other services that the borrower purchased from the school." *Id.*

by the Secretary long after the loans at issue were made.[47]

It is noted that the regulations in effect between 1981 and 1986 recognized the potential existence of an origination relationship between participating lenders and schools, defined that relationship as noted above, *see* 34 C.F.R. § 682.200, and set forth certain consequences of a school's origination of a GSLP loan. For example, under the guaranty agency portion of the regulations, special rules set forth maximum loan amounts which could be made by a lender "for a loan ... made or originated by a school." *See* 34 C.F.R. § 682.-401(b)(3).

Additionally, under the FISLP portion of the regulations, subheading § 682.509(a)(2) entitled "due diligence in making and disbursing a loan," the regulations provided:

> Except as may be authorized by the Secretary, a lender may not delegate its loan-making functions except to a school with whom the lender has an origination relationship. If an origination relationship exists, the lender may rely in good faith upon statements of the borrower contained in the loan application, but may not rely upon statements by the school in the application. A non-school lender which does not have an origination relationship with a school may rely in good faith upon statements of both the borrower and the school which are contained in the application.

*See* 34 C.F.R. § 682.509.[48]

No other regulatory or statutory provisions have been found by the court nor cited by the parties which were in effect between 1981 and 1986 articulating the Secretary's policy as to the effect of an origination relationship upon whether a lender may be held subject to a student's school-related defenses. The above-referenced section, 34 C.F.R. § 682.509, is, quite simply, as close as the regulations come to describing the impact of such a relationship upon lender obligations under the program.

Importantly, it is also noted that 34 C.F.R. § 682.509 was, between 1981 and 1986, found solely within that portion of the Secretary's regulations pertaining to the FISLP facet of the program, with no comparable provision being found in the regulations pertaining to both facets of the GSLP, nor in that portion of the regulations pertaining specifically to the guaranty agency aspect of the program which is at issue here.[49]

Although the consequences of an origination relationship were, at the relevant time, set forth only in 34 C.F.R. § 682.509(a)(2) pertaining to the FISLP, plaintiffs assert that the substance of that provision is indicative, albeit in "somewhat cryptic fashion," of the Secretary's consistent position, even during the period in question in this case, that lenders with an origination relationship with a participating school may not discharge their "due diligence" obligation in the making of a GSLP loan by merely relying upon statements concerning the loan transaction by the school, and that the existence of such a relationship would subject the lender to any school-related defenses to the loan obligation. Admitting that the provision is not as clear as the Department of Education's most recent pro-

---

**47.** The bank defendants argue "it should come as no surprise to anyone that the Secretary has reacted to these legal challenges by adopting the defensive posture typical of any entity which finds itself one of multiple defendants ... that is to say, the Secretary has adopted the only defense strategy which enables it to point the finger at its co-defendants."

Moreover, HEAF asserts that the explanations by the Secretary in the letters which undertake to express Education's view on the effect of an origination relationship, "while interesting, are in no way binding ... and cannot be given the force and effect of law." *See, e.g.,* Brief of HEAF, at p. 10 n. 4.

**48.** Applicable to both the guaranty agency program and the FISLP, the regulations in effect between 1981 and 1986 defined "due diligence" on the part of the lender in the "making, servicing and collection of GSLP loans" generally as "the utilization by a lender ... of practices at least as extensive and forceful as those generally practiced by financial institutions for consumer loans." *See* 34 C.F.R. § 682.200.

**49.** It is observed, however, that the current version of the regulations now set forth the identical language as that formerly found only in the FISLP portion of the regulations. *See* 34 C.F.R. § 682.206(a)(2).

nouncements concerning the consequences to a lender of an origination relationship with a participating school, plaintiffs point out that, when § 682.509(a)(2) was promulgated in 1976, the Office of Education, which was then administering the program explained the purpose which prompted the promulgation of § 682.509(a)(2) as follows:

> Although it has been generally understood and accepted that a promissory note made under the FISL Program is not a negotiable instrument and that a purchaser of such a note cannot become a "holder in due course," as those terms are defined by commercial law, questions have still remained concerning the proper interpretation and application of the Act and regulations.
>
> The purpose of these regulations is to have lenders recognize both the defenses which can be raised against loan paper and their responsibility to exercise prudent business practices in making and purchasing such loans. Lenders which buy school-originated loans or which have special relationships with schools may rely upon assurances and information provided by the students, but may not rely upon the certification of the education institutions. In these latter cases, lenders have the responsibility of making prudent professional judgments about the quality of such loans including the practices or financial stability of the schools originating the loans.
>
> ... This regulation ... makes it clear that the purchasing lender is required to make a sound professional judgment regarding the financial stability and the business practices of a school before purchasing loans originated by the school.
>
> ....
>
> It is possible that some individual non-school lenders having special relationships with educational institutions ... may exercise a stringently independent business relationship with such schools. However, this would not normally be the case, and there is no assurance that such an arm's length relationship can be maintained especially at a time of serious financial difficulties for either the school or the lender. While a "specially-related" lender must, therefore, bear additional risks in making such loans, the special relationship should provide the lender with a unique ability to make a comprehensive and accurate evaluation of the school's ability to meet its responsibilities, both educationally and relating to the loan program, and to assure that the certifications by the school are reliable.

*See* 41 Fed.Reg. 4496 (Jan. 29, 1976).

In *Veal v. First American Savings Bank*, the Seventh Circuit considered the origination relationship argument also posed by plaintiffs in that case. 914 F.2d 909 (7th Cir.1990). In resolving the issue, the *Veal* court noted the existence of the regulatory definition of origination relationship set forth in 34 C.F.R. § 682.200. The court also recognized that, in cases involving the FISLP portion of the program, a lender's ability to recoup from the federal government the full amount of the loan upon which the borrower has defaulted may be limited in cases in which the school originated the loan in question, 914 F.2d at 913, and noted further that, in deciding whether to approve a default claim under the FISLP aspect of the program, the Secretary:

> (1) ... considers matters affecting the enforceability of the loan obligation, and whether the loan was made and administered in accordance with the Act and applicable regulations; [and]
>
> (2) ... deducts from a claim any amount that is not a legally enforceable obligation of the borrower, except to the extent that the defense of infancy applies.

914 F.2d at 914, citing 34 C.F.R. § 682.-513(a). The court concluded, however:

> As much as the students would like to take refuge in these regulations, they cannot; they did not borrow under the FISL or Federal PLUS programs. They hold loans guaranteed by private or state agencies that are not subject to the protections of the above regulations. These protections inapplicable, the students of-

fer no alternative support for this first argument, which must fail.

914 F.2d at 914 (citations omitted).

Here, plaintiffs point out that, unlike the plaintiffs in *Veal*, they have offered substantial alternative support for their origination relationship argument, namely, the Secretary's own written articulations of policy as contained in the various letters referenced above. They also rely upon the existence of 34 C.F.R. § 682.509(a)(2) pertaining to the effect of an origination relationship under the FISLP portion of the regulations during the period of time in question, and the Secretary's own explanation of the purposes underlying that portion of the regulations in the 1976 Federal Register which is entirely consistent with the Department of Education's current day policy articulations and regulations pertaining to the consequences of an origination relationship.

What plaintiffs' argument fails to recognize, however, is that the 1976 Federal Register text upon which they rely to support a regulatory basis for their origination relationship argument as against the bank defendants sets forth in plain and unambiguous language that § 682.509(a)(2) is applicable only to loans under the FISLP portion of the program. The commentary section to the Federal Register cite relied upon by plaintiffs specifically states:

B. GENERAL CONCERNS

*Comment.* Several commenters seemed to think that the proposed rules applied to loans guaranteed by State or private nonprofit agencies.

Response. These regulations apply only to loans insured by the Commissioner under the Federal Insured Student Loan Program.

*See* 1976 Fed.Reg. 4496 (January 29, 1976).

If, in fact, an origination relationship between a school and lender would have rendered a guaranty agency program lender subject to a student's school-related defenses between 1981 and 1986, it is curious that

the Secretary's regulations, "Dear Colleague letters," or policy manuals would not have so stated. No materials have been submitted to indicate that the lenders were so advised.

Plaintiffs' argument that the lenders should be held subject to the students' school related claims to the extent the lender had an origination relationship with NBC would be quite persuasive if the loans at issue had arisen under the FISLP rather than the guaranty agency portion of the GSLP. Indeed, the existence of § 682.-509(a)(2) and the 1976 Federal Register explanation of that regulation, would, in all likelihood, establish a sufficient basis for the court to conclude that the lenders were fairly put on notice as to the consequences of having such a relationship with a participating school.

However, in the complete absence of any statutory or regulatory basis upon which to conclude that the lenders were, prior to or during the period of time in which the subject loans were made, apprised of the consequences of having an origination relationship with a participating school under the guaranty agency portion of the regulations, the court finds that theory to be an insufficient basis upon which plaintiffs may maintain their cause of action against the lenders.

■ That the bank defendants cannot be held subject to the plaintiffs' school-related claims on the origination relationship theory does not, however, warrant the conclusion that the Secretary and HEAF may nonetheless proceed to collect on the students' loans despite the possible existence of such a relationship between certain of the lenders and NBC as alleged by plaintiffs. There has been no argument posed by the Secretary that his position on the effect of an origination relationship is new, or that the existence of such a relationship between a school and lender would affect collection efforts only on loans transacted after 1986.[50]

---

**50.** In a recent edition of the Federal Register, the Secretary noted that he was "proposing to codify his longstanding view regarding the defenses to a borrower's liability for repayment of

a GSL loan." *See* 55 Fed.Red. 48,327 (to be codified at 34 C.F.R. 682.215) (proposed Nov. 20, 1990). The statement continues:

Interestingly, the Secretary has not moved to dismiss that portion of Count I of plaintiffs' amended complaint wherein the plaintiffs have alleged that the existence of origination relationships between NBC and certain of the bank defendants would render the Secretary, as well as the lenders and HEAF, subject to their school-related defenses. *See* Amended Complaint at Count 1, ¶ 158(a). *See also,* Secretary's Motion to Dismiss, at ¶ 1. In the absence of any argument by the Secretary that plaintiffs' position on the effect of an origination relationship between a school and lender is incorrect as a matter of law, and in the absence of any argument by the Secretary that the Department of Education's stated position on the origination relationship issue is applicable only to a period of time subsequent to the loans at issue, the court concludes that the Department of Education should be held to its consistently stated policy, namely, "[i]f the court finds that the school acted as an agent of the lenders and determines that the loans, for that reason, are not wholly or partially unenforceable against the borrowers, the Department would honor that determination, and would regard these loans, to that extent, as not covered by reinsurance, and would neither attempt to collect them nor expect guaranty agencies to collect them." *See, e.g.,* Solarz letter, attached as Exhibit 5 to plaintiffs' amended complaint; Newman letter, attached as Appendix C to plaintiffs' memorandum; Compromise & Write–Off Procedures, attached as Exhibit 28 to the amended complaint.[51]

## IX.

The court concludes that the plaintiffs have stated valid, non-preempted theories upon which the defendants may be held subject to the students' school related defenses under certain portions of state statutory law. *See, e.g.,* W.Va.Code § 46A–2–103(1)(a)(i); § 46A–2–103(1)(a)(vi). Plaintiffs claims must fail, however, to the extent they are predicated upon an assertedly close connection between the original lenders and NBC, which connection is resultant from actions taken by the lenders which are dictated by the federal act and regulations. *See* W.Va.Code § 46A–2–103(1)(a)(iv); § 46A–2–103(1)(a)(v).

Plaintiffs' cause of action also fails to state a claim against the bank defendants to the extent that it is predicated upon the existence of an origination relationship between certain of the lenders and NBC. Given the Secretary's policy articulations, however, the court finds that plaintiffs have stated a valid claim against the Secretary for discharge of their loan obligations if such relationships are found to have existed between the bank defendants and NBC. Furthermore, inasmuch as HEAF is, as a practical matter, the entity which holds the majority of the notes in question and is required to pursue collection activity against the loans with due diligence, the court finds that HEAF should likewise be held subject to the Secretary's apparent policy of non-collection on GSLP loans deemed unenforceable against the original

Generally, a student who borrows under the GSL Program from a third-party lender remains legally responsible for repaying the loan, even if the school fails to provide the student with the services purchased by the student. However, if an origination relationship exists between the lender and the school, the school's failure to deliver those services provides the student with a defense against the obligation to repay the lender all or part of the loan, absent a disclaimer by the lender as discussed below. 55 Fed.Reg. 48327. Within the explanation of the proposal, the Secretary also solicited commentary on "how the definition of 'origination' could be more precisely crafted to reflect the common law of agency," indicating that the proposed changes would undertake "to give a

lender better notice of the circumstances under which the enforceability of a loan it holds may be jeopardized by a school's failure to comply with its educational responsibilities." *Id.*

51. The question left unanswered at this juncture is, of course, how the apparent absence of any regulatory guidance from the Department of Education to lenders and to HEAF on the consequences of an origination relationship with a participating school prior to or between 1981 and 1986 will impact upon the Secretary's anticipated efforts to recoup his losses on the GSLP loans ultimately found to be unenforceable due to the existence of such a relationship between NBC and the lenders. The court does not undertake to pass upon that issue within the context of the defendants' motions to dismiss.

lenders by virtue of origination relationships shown to have existed between such lenders and NBC.

Multiple other legal theories have been asserted by the plaintiffs in their amended complaint to support their position that the subject loans should be held unenforceable by the Secretary and HEAF. However, based upon the court's resolution of the preemption issues raised by HEAF and the bank defendants, and the resolution of the origination relationship theory relied upon by the plaintiffs, consideration of the remaining theories asserted by plaintiffs is deemed to be unnecessary at this stage of the litigation.

Consequently, having concluded that none of the defendants can be dismissed at this juncture as a matter of law, the court finds no just reason to delay consideration of the motion for class certification raised by the plaintiffs merely for the court to consider the numerous alternative legal theories asserted by plaintiffs to render the subject loans unenforceable. To delay class certification pending the court's consideration of the various legal theories relied upon as alternative claims for relief may prove unnecessary to the final disposition of this matter and would substantially delay the final resolution of a lengthy course of litigation between the parties to this dispute.

Accordingly, it is ORDERED that the motion to dismiss each of the defendants be, and the same hereby is, denied.

It is further ORDERED that all counsel shall appear for the purposes of a status conference on the merits of this action and a hearing on class certification issues at 1:30 p.m. on June 25, 1991.